**Ann BROWN, Plaintiff-Appellant,**

v.

**FERRO CORP., et al.,
Defendants-Appellees.**

No. 84–3102.

United States Court of Appeals,
Sixth Circuit.

Argued March 12, 1985.

Decided June 7, 1985.

Isaac Schulz, Rosenzweig, Schulz & Gillombardo Co., L.P.A., Cleveland, Ohio, Lawrence A. Sucharow, Jonathan M. Plasse (argued), Goodkind, Wechler & Labaton, New York City, for plaintiff-appellant.

Phillip A. Contreras, James A. Smith (argued), James P. Murphy, George Von Mehren, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants-appellees.

Before MERRITT and WELLFORD, Circuit Judges, and GILMORE, District Judge.[*]

* The Hon. Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

GILMORE, District Judge.

This is an appeal in a stockholder's derivative suit from a district court decision dismissing the suit without prejudice for lack of ripeness and failure to show that the corporation has suffered actual damages as a result of the adoption of a severance agreement program. For the following reasons, the district court is affirmed.

I

Plaintiff is the owner of ten shares of common stock of defendant Ferro Corporation. Ferro Corporation is a nominal defendant, and the principal defendants are eleven members of Ferro's Board of Directors. Jurisdiction rests on diversity, and Ohio law governs.

While plaintiff's original complaint challenged several decisions made by Ferro directors, only one of these decisions, the adoption of a severance agreement program, is the subject of this appeal. The severance agreement program is what is commonly known as a "golden parachute" agreement, that is, an agreement between the officers and the corporation providing that in the event of a take-over and change of leadership, the officers can "bail out" and retain very favorable benefits from the corporation.

The severance agreements were adopted in response to a perceived take-over attempt by Crane Company following Crane's filing of a Schedule 13(D) with the Securities and Exchange Commission to disclose its purchase of 5.55 percent of Ferro's outstanding shares. Ferro's Compensation and Organization Committee, comprised of five outside directors, recommended the severance agreements for fourteen key executives in July 1981. These were authorized by Ferro's Board of Directors by unanimous vote, with the three inside directors who were covered by the agreement abstaining.

The severance agreements require Ferro to pay severance benefits to certain officers if their employment is terminated for any reason other than death or normal retirement within two years after a "change in control."[1] The benefits include: (1) a lump-sum severance payment equal to three years' pay for three officers/directors and two years' pay for the remaining officers; (2) a lump-sum payment calculated to approximate present value of the additional retirement benefits; (3) continued participation in Ferro's Group Life, Health, and Medical Insurance coverage for at least two years; and (4) a cash payment representing the value of all outstanding stock options held by the officers on the date of termination.

The agreements require Ferro to establish an irrevocable escrow account and to make deposits reflecting a certain percentage of the amounts that would be payable to each officer. Under the provisions of the agreements, as well as the terms of the escrow agreement, the funds on deposit remain Ferro's unless and until a change in control occurs. Under the escrow agreement, Ferro directs the investment of the funds and receives all income derived from these investments.

To date, approximately $1,500,000 has been deposited into an escrow account, and deposits into the account continue. None of the key officers subject to the agreement left Ferro during the turbulent period in which Crane's holdings threatened uncertainty as to the future course of the corporation. No change of control has occurred, no monies have been paid out of the accounts to any officers, and the agreements remain in full force and effect. The funds have been invested in certificates of

1. The agreements provide that:
   A change in control will be deemed to have occurred if (i) any person or group acting in concert becomes the beneficial owner of 25% or more of the Company's then outstanding voting securities, or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors cease for any reason to constitute at least a majority thereof unless the election or nomination of each new director was approved by the vote of at least two thirds of the directors still in office who were directors at the beginning of the period.

deposit earning from 8 to 14 percent interest.

In her complaint, plaintiff alleged that the adoption of the severance agreement program served no valid business purpose or interest of Ferro or its stockholders, and was designed solely to serve the pecuniary interest of the directors involved, to preserve the directors' control over Ferro, and to discourage potential acquirers from obtaining a controlling interest in Ferro. Plaintiff claims that the corporation has been damaged as a result of the payment of nearly $1,500,000 into the irrevocable escrow account as it cannot withdraw, lend, borrow upon, or hypothecate these escrowed funds.

On defendant's motion for summary judgment, the district court dismissed the claim without prejudice, holding that (1) the complaint did not present an "actual case or controversy" that is ripe for decision, as required by Article III of the Constitution, and (2) no actual damage to the corporation was shown, as required before a stockholder's derivative suit can be maintained under Ohio law. The trial court held:

> In the present case Ferro has not been harmed since, under the severance agreement, payments to the officers are contingent upon a 'change in control' that has not occurred and is not presently foreseeable. Although Brown makes several arguments to the contrary, they are without merit....
>
> In summary, the court finds that Brown's claims with regard to the severance agreements are inappropriate for judicial resolution under the present circumstances and that none of the parties will be harmed as a result of the court's withholding consideration of the severance agreements. (Joint Appendix vol. 1, p. 174, 176.)

On appeal, plaintiff argues that the corporate funds allocated to the irrevocable trust, and thereby removed from the corporation's unrestricted use, are substantial and show sufficient harm to Ferro to enable her to maintain the action. Plaintiff also argues that the threat of harm is imminent and real and that declaratory relief is warranted because the directors failed to include various safeguards in the severance agreements, as a result of which it is possible for the officers to fabricate a "change of control" solely to obtain the very favorable severance benefits. She also claims that the court erred in finding the matter not ripe for adjudication since judicial avoidance of the claim will result in continued restriction of corporate funds and continued risk of loss of funds through payment of the funds upon a "change of control," whether real or fabricated.

Plaintiff is seeking a judicial determination that the severance agreements were adopted by the directors for selfish reasons and not in the best interests of the corporation or its shareholders, and that they would not pass muster under the "business judgment rule" generally used to judge the validity of Board action.[2] The Court recognizes that "golden parachute" agreements of the type adopted by Ferro have been the subject of much controversy in recent years and that recommendation has been made by the SEC to Congress to enact legislation prohibiting their adoption. *See* SEC Advisory Committee on Tender Offers, "Report on Recommendations," July 8, 1983. However, it is not the function of this Court to determine whether the "golden parachute" agreement in this case is an agreement that can be supported under the "business judgment rule" or is acceptable as a corporate practice. This Court ex-

---

**2.** The "business judgment rule" is invoked by courts to avoid the difficult task of reviewing corporate decision making, and to avoid substituting the court's uninformed opinion for that of experienced corporate management. *See generally Beard v. Elster,* 160 A.2d 731 (Del.Ch. 1960); *Cohen v. Ayers,* 449 F.Supp. 298 (N.D.Ill. 1978), *aff'd* 596 F.2d 733 (7th Cir.1979); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979); *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D.Mich.1980); *Mills v. Esmark, Inc.,* 544 F.Supp. 1275 (N.D.Ill.1982). *Mills* noted that the rule "reflects the reality that corporate decisions are better left to those who are close to the facts and have the experience to weigh the significance of those facts in an increasingly complex business environment." *Id.* at 1282, n. 3.

presses no opinion upon the validity of such agreements for the reason that the controversy here is not yet ripe for determination and declaration with reference to such agreements. Further, it does not appear that plaintiff has suffered damages as required by Ohio law before a shareholder derivative suit such as the instant one can be maintained.

## II

Article III of the Constitution of the United States requires that parties seeking to invoke the power of federal courts must allege an actual case or controversy. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

> Plaintiffs in the federal courts "must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." (citation omitted) There must be a "personal stake in the outcome" such as to "assure that concrete adverseness which shapens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions." (citation omitted) ... Abstract injury is not enough. It must be alleged that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged statute or official conduct. (citation omitted) The injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."

*Id.* at 493–4, 94 S.Ct. at 674–5.

■ The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances. As the Court in *Pacific Gas & Electric Co. v. Energy Resources Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), pointed out (quoting from *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515–1516, 18 L.Ed.2d 681) (1967):

The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements ..." In *Abbott Laboratories*, which remains our leading discussion of the doctrine, we indicated that the question of ripeness turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."

*Id.* at 200–1, 103 S.Ct. at 1720.

Wright, Miller & Cooper, 13A *Federal Practice & Procedure*, § 3532.1, at p. 114, pointedly observe that:

> Ripeness doctrine serves the same general purposes as other branches of justiciability theory. The central perception is that courts should not render decisions absent a genuine need to resolve a real dispute. Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance.... Perhaps more important, decisions involve law making. Courts worry that unnecessary lawmaking should be avoided, both as a matter of defining the proper role of the judiciary in society and as a matter of reducing the risk that premature litigation will lead to ill-advised adjudication. These concerns translate into an approach that balances the need for decision against the risks of decision. The need to decide is a function of the probability and importance of the anticipated injury. The risks of decision are measured by the difficulty and sensitivity of the issues presented, and by the need for further factual development to aid decision.

Finally, this Court in *Young v. Klutznick*, 652 F.2d 617 (6th Cir.1981), considered the doctrine of ripeness, stating:

> Standing doctrine imposes constitutional limitations on federal courts' jurisdiction. Even when jurisdiction is technically present, however, the Supreme Court has recognized that "problems of prematurity and abstractness ... may prevent adjudication in all but the exceptional case." (citations omitted) Such ques-

tions of ripeness, the court has held, are resolved through two inquiries. Courts must first "determine whether the issues tendered are appropriate for judicial resolution" and then "assess the hardship to the parties if judicial relief is denied at that stage." (citation omitted)

The precise focus of ripeness doctrine is that it is "peculiarly a question of timing." (citation omitted) As Justice Fortas has pointed out in the context of pre-enforcement attacks on administrative regulations, the reason for deferring consideration of abstract or premature claims is to allow government processes "an opportunity to function—to iron out differences, to accomodate special problems.... The courts do not and should not pass on these complex problems in the abstract and the general—because these regulations peculiarly depend for their quality of substance upon the facts of particular situations. *We should confine ourselves—as our jurisprudence dictates—to actual, specific, particularized cases and controversies, in substance as well as technical analysis."* (citations omitted)

*Id.* 625–6.

### III

■ In resolving the ripeness issue, we cannot conclude that the lower court abused its discretion in declining to adjudicate the validity of the severance agreement program. Throughout this litigation, the only damages that plaintiff has shown is the unavailability of the escrowed funds for unrestricted corporate use and the possible deterrent effect of the existence of the "golden parachute" agreements on future take-over attempts.[3] The district court correctly concluded that the damage resulting from tying up these funds is nominal at best, as the corporation continues to receive a healthy return on its investment. These funds have not been lost to the corporation, but are actually being put to good use.

The fact that all sides have tended to speculate as to the future course of events also supports the district court's decision to decline jurisdiction at this time. Plaintiff suggests that a fabricated contractual "change in control" might be brought about by the officers themselves solely to collect severance benefits. The district court, on the other hand, suggested that a new board of directors might be inclined to challenge the validity of these payments on their own, or that the directors of Ferro might decide to alter significantly or even eliminate the current severance agreements before any change in control occurs, thus obviating the need for court intervention. All of this speculation serves to highlight the fact that it is still unclear how these events will play out, and that judicial intervention at this time would be premature, as the case is not ripe for decision.

*Mills v. Esmark, Inc.,* 544 F.Supp. 1275 (N.D.Ill.1982), presented a factual situation nearly identical to the facts here. The plaintiffs in *Mills* alleged that the directors violated their fiduciary duty when they recommended that severance agreements be signed between Esmark and the principal officers under which each officer's compensation would be guaranteed for two or three years if he lost his position because of a merger or acquisition of Esmark. The court dismissed the claim, stating:

> Plaintiffs also failed to allege that any merger or acquisition of Esmark has taken place since the agreements became effective. Whether any future merger or acquisition would result in a waste or gift of corporate assets because of these purported agreements is a matter not ripe for consideration here.

*Id.* at 1290–91.

■ In addition, as the district court pointed out, Ohio law requires as a prerequisite to any shareholder's derivative suit that the corporation sustain damage as a consequence of the allege wrong. *Barsan v. Pioneer Savings and Loan Co.,* 163 Ohio St. 424, 127 N.E.2d 614 (1955). Share-

---

**3.** In her briefs and in oral argument on appeal appellant did not seriously contend that the

"golden parachute" agreements would have a deterrent effect on future take-over attempts.

holder's derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated. *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), *In re General Tire and Rubber Co. Securities Litigation,* 726 F.2d 1075 (6th Cir. 1984). Ferro is an Ohio corporation, and, as pointed out above, Ohio law requires proof of damages to the corporation before a shareholder's derivative action can be maintained.

■ We agree with the lower court that Ferro has sustained no damages since any payments are contingent upon a change of control and a change of control is not presently foreseeable.

Therefore, because the case is not ripe for adjudication and because the corporation has suffered no damages, the determination of the district court is AFFIRMED.

WELLFORD, Circuit Judge, concurring.

Although it is difficult to discern any advantage to *shareholders* in the broad benefits bestowed on certain corporate officials under the severance agreements in dispute, I concur with Judge Gilmore that the case is not now ripe for adjudication.

MERRITT, Circuit Judge, dissenting.

The plaintiff stockholder alleges that Ferro Corporation has been injured because $1.5 million has been removed from the Corporation's unrestricted use and placed in an escrow account to assure that funds are available to cover the "golden parachute" severance agreements. The fact that interest is being earned on the funds in the escrow account is beside the point; the foregone opportunity to put the funds to their most profitable use constitutes a tangible, real and continuing injury to the Corporation. In this allegation of injury, Brown has clearly met the requirement that loss or damage to the Corporation must be claimed in order to maintain a shareholder's derivative action. 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5947, at 83 (rev. perm. ed.

1984); *Barsan v. Pioneer Savings & Loan Co.,* 163 Ohio St. 424, 127 N.E.2d 614 (1955).

The majority opinion ignores these allegations of immediate injury, and argues that the case is not ripe for adjudication because it is unclear whether a change in control will occur, triggering the golden parachutes, and because a new board may decide to alter or eliminate the golden parachutes at some time in the future. This argument misapplies the ripeness doctrine and has the plain consequence of eliminating any opportunity to challenge the legality of the severance agreements through a shareholder's derivative action.

Under the doctrine of ripeness, " 'problems of prematurity and abstractness' ... may prevent adjudication in all but the exceptional case." *Young v. Klutznick,* 652 F.2d 617, 625 (6th Cir.1981) (quoting *Buckley v. Valeo,* 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976)). The doctrine rests on the "values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government." 13A C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3532.1, at 120 (2d ed. 1984). As the Court stated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), the basic rationale of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."

The present case involves the validity under Ohio law of agreements calling for funds to be set aside today so that they may be available for future change of control compensation. There is no constitutional issue presented, and this court is not asked to pass upon the validity of legislative or administrative action. The separation of powers concerns justifying the ripeness doctrine are not present in this case, and the majority has taken ripeness principles from their proper context and applied

these principles without regard to their underlying rationale.[1]

Moreover, even if the ripeness doctrine did apply here, courts invoking ripeness must first "determine whether the issues tendered are appropriate for judicial resolution," and then "assess the hardship to the parties if judicial relief is denied at that stage." *Young v. Klutznick*, 652 F.2d at 625 (citing *Toilet Goods Association v. Gardner*, 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967)). The issue presented here is whether the golden parachutes serve a valid business purpose, and there is little question but that this issue is "appropriate for judicial resolution."

Even more importantly, very real hardship may be caused by our failure to consider the validity of the golden parachutes at this time. The hardship is the probable loss of any possibility of challenging the severance agreements through a shareholder's derivative action. A shareholder's derivative action is the property right of the corporation on whose behalf it is asserted, and under O.R.C. § 1701.82, all "property of every description" of a merged corporation is possessed by the surviving or new corporation into which it is merged.[2]

Interpreting a very similar Delaware statute, the Delaware Supreme Court has recently held that a target company's former shareholder had no standing after the target had become the wholly owned subsidiary of its acquiror to bring a derivative action challenging golden parachutes because only the parent held stock in its wholly owned subsidiary and hence only the parent could maintain a derivative action against the subsidiary's former officers. *Lewis v. Anderson*, 477 A.2d 1040 (Del.1984).

The clear implication of the statutory passage of the derivative action to the acquiring corporation is that Ferro Corporation shareholders will lose their opportunity to challenge the golden parachutes after a merger or change of control, even as that same change of control activates the parachutes and delivers up to $5 million in compensation to the departing officers. Thus, under the majority's decision, the shareholder is barred by the ripeness doctrine from challenging the parachutes before an acquisition or merger, and barred by the statutory passage of corporate property rights from challenging the parachutes after the acquisition or merger. A derivative action challenging the golden parachutes could only be brought by the acquiring corporation, but the practical likelihood of this is slim; the possibility that the acquiror would challenge the golden parachutes would only stiffen target management's opposition and thereby negate a primary reason for creating the golden parachutes.

Consequently, I would hold that ripeness does not bar Brown from bringing the present action, and that the prerequisites for maintaining this derivative action have been met.

---

1. Although purportedly relying on ripeness, the decision in *Mills v. Esmark*, 544 F.Supp. 1275, 1290 (N.D.Ill.1982), in fact held that mere allegations that golden parachute agreements had been *recommended* did not state a claim because "[p]laintiffs fail to allege that Esmark and its principal officers *actively entered into* the agreements at issue" (emphasis supplied).

2. In pertinent part, O.R.C. § 1701.82 provides:
   Effect of merger or consolidation: limitation of action.
   (A) When a merger or consolidation becomes effective:

(1) The separate existence of each constituent corporation other than the surviving corporation in a merger shall cease;
....
(3) The surviving or new corporation possesses all assets and property of every description, and every interest therein, wherever located, and the rights, privileges, immunities, powers, franchises, and authority, of a public as well as of a private nature, of each of the constituent corporations, and all obligations belonging to or due to each of the constituent corporations, all of which are vested in the surviving or new corporation without further act or deed.