Charles FRENCH, et al.

v.

Bill BONER, Mayor, et al.

No. 3-91-0312.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 27, 1991.

---

George E. Barrett, Douglas S. Johnston, Phillip A. Purcell, Barrett, Johnston & Parsley, Nashville, Tenn., for plaintiffs.

Susan Short Jones, James L. Murphy, James L. Charles, Nashville, Tenn., for defendants.

## MEMORANDUM

HIGGINS, District Judge.

This matter is before the Court as a reapportionment action pursuant to the Fourteenth and Fifteenth Amendments of the United States Constitution, the Voting Rights Act of 1965, as amended (42 U.S.C. § 1971 et seq.), and 42 U.S.C. §§ 1983 and 1988.

The plaintiffs are three members of the Metropolitan Council, two white and one black; and four private citizens of Nashville, Tennessee, two white and two black.

Defendant is The Metropolitan Government of Nashville and Davidson County.[1] The Metropolitan Government is a consolidated government, pursuant to Section 9, Article XI of the Tennessee Constitution. It is a consolidation of the former city government of Nashville and the former county government of Davidson County, Tennessee. As such, it carries on general governmental functions of a local government in the State of Tennessee, pursuant to its Charter.

The Metropolitan Government will conduct general elections on August 1, 1991, to elect the Mayor, Vice Mayor, five Council members-at-large and thirty-five single-district Council members in the forty-member Council. The plaintiffs contend, and the defendant concedes, that the current Council districts, which were apportioned in 1981 based upon the 1980 census, are malapportioned in light of the 1990 census.

The plaintiffs have filed an amended complaint seeking a declaratory judgment that the present Metropolitan Council is malapportioned and that the United States Constitution mandates reapportionment prior to the next Council election. The elections are presently scheduled for August 1, 1991, and the qualifying date for candidates was noon on June 6, 1991.[2] The plaintiffs request that the Court order the Metropolitan Council to adopt a properly apportioned plan, or, in the alternative, that the Court fashion a reapportionment plan, before the next election. Furthermore, the plaintiffs seek a preliminary injunction to enjoin any councilmanic election pending the proper apportionment of the Council based upon the 1990 federal census.

Jurisdiction is based upon 28 U.S.C. § 1343 for causes of action arising under 42 U.S.C. §§ 1971, 1973, 1983 and 1988; and 28 U.S.C. § 1331 for claims based on the Fourteenth and Fifteenth Amendments to the Constitution.

### I.

On April 24, 1991, the plaintiffs filed a motion for a show cause hearing (Docket Entry No. 2). On April 25, 1991, the Court entered a show cause order (Docket Entry No. 4) requiring the defendant to show cause why the Court should not issue a preliminary injunction to delay the August 1, 1991, Metropolitan councilmanic elections pending the adoption of a reapportionment plan based upon the 1990 census.

On May 10, 1991, the defendant filed a motion to dismiss the action on two grounds: (1) lack of subject matter jurisdiction because the action is not ripe and (2)

---

1. The individual defendants and defendants Planning Commission of The Metropolitan Government and Davidson County Election Commission, which were named in the original complaint, have been dismissed, pursuant to an Agreed Order entered on May 1, 1991.

2. To be qualified as a candidate for the Metropolitan Council, a person must have lived within the area of The Metropolitan Government for one year and within the district for six months. Metropolitan Charter, section 3.02.

failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R.Civ.P.[3] (Docket Entry No. 10).

On May 22, 1991, the Court held a show cause hearing. The Court heard oral arguments on the defendant's motion to dismiss and the plaintiffs' application for preliminary injunction on June 5, 1991. Each party has submitted proposed findings of fact and conclusions of law, which the Court has considered, along with the numerous other documents filed in this action.

For the reasons set forth in this memorandum, the Court finds in favor of the defendant on its motion to dismiss.

## II.

The parties have stipulated to certain facts, which are incorporated herein, along with the salient facts gleaned from the two hearings in this matter.

The Metropolitan Charter[4] provides, *inter alia*, that the Metropolitan Council will be the legislative body for the government. The Council is divided into thirty-five single-member districts and five Council positions elected at large. Council members, along with the Mayor and Vice Mayor, are elected to four-year terms.

In 1965, the Charter was amended to provide that, after 1971, general elections are to be held every four years on the first Thursday of August. All persons who are lawfully registered and who are qualified to vote for members of the Tennessee General Assembly shall be eligible to vote in Metropolitan elections.

There have been two reapportionments of The Metropolitan Government. The Council was reapportioned prior to the 1971 elections based on the data received from the 1970 census. By March 11, 1971, the Planning commission had adopted a reapportionment plan (Ordinance No. 71–1389) and filed it with the Council. This ordinance was introduced in the Council on March 16, 1971, passed on third and final reading on May 4, 1971, and approved by the Mayor on May 6, 1971.

The reapportionment plan (Ordinance No. 81–701), based on the 1980 census, was introduced in the Council on September 1, 1981, and passed on third and final reading on October 6, 1981. The ordinance became effective without the signature of the Mayor on October 20, 1981. Both the 1983 and the 1987 Metropolitan elections were based on the 1981 reapportionment ordinance.

John Palm, Division Manager of the Advance Planning and Research Division of the Metropolitan Planning Commission, testified that an important difference between the 1971 reapportionment and the current reapportionment is the consideration of race, now required by the 1982 amendment to the Voting Rights Act. He testified that this difference makes the 1971 and 1991 redistrictings not comparable. Further, Mr. Palm speculated that, had they not considered race, the Planning Commission staff would have had a draft of a redistricting plan completed at the end of March 1991.

On May 30, 1990, the Metropolitan Planning Commission staff prepared a schedule for reapportionment, which was to be based on the 1990 census. The staff proposed in the schedule that reapportionment be completed prior to the August 1991 elections. On July 12, 1990, the Planning Commission approved criteria for reapportionment of the Council. The primary criteria

---

3. Rule 12(b), Fed.R.Civ.P., provides that if, on a motion asserting failure to state a claim for relief, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of according to Rule 56, Fed. R.Civ.P. Either the pleader or the moving party or both may trigger the conversion provision into operation by submitting outside material. In the instant action, both parties submitted outside material in the form of affidavits and exhibits sufficient to convert the motion from one to dismiss to one for summary judgment.

However, the Court disposes of the action based only upon the defendant's first ground for dismissal—lack of subject matter jurisdiction because the action is not ripe. Therefore, since the Court does not reach the defendant's second ground for dismissal, which is based upon Rule 12(b)(6), Fed.R.Civ.P., the motion will not be converted to one for summary judgment.

4. The Charter of The Metropolitan Government became effective on April 1, 1963, having been adopted in 1962.

included: a required population balance, a required racial composition and internally consistent and logical geographical boundaries.[5] On August 5, 1990, the Executive Director of the Planning Commission wrote to the Vice Mayor, stating that, given the availability of data and the timetables already in place, it would not be possible to complete reapportionment before the August 1991 elections.

On December 27, 1990, the Planning Commission and the Planning and Zoning Committee of the Council held a joint meeting. One of the topics discussed was Council reapportionment. The Planning Commission staff was instructed to begin its work on reapportioning as quickly as the census data became available, and to take the time necessary to do the job thoroughly, but to take no more time than was necessary. After the Planning Commission staff completed their work, the Planning Commission and the Council would determine their schedules to complete a reapportionment plan.

On January 4, 1991, the Planning Commission acquired a computer software program for reapportionment, having previously determined through estimates of population growth that reapportionment probably would be required.

In February, a Planning Commission staff member called the Census Bureau and asked when the 1990 census data would be released. Since Tennessee did not have state-wide elections this fall, it was not given priority. In fact, it was listed as a fourth-tier state. The staff member was told that data for Tennessee would not be released until March or April, even though Nashville was scheduled to hold local elections in August.

The Tennessee State Planning Office received the official 1990 census data on March 5, 1991. Mr. Palm testified that a Planning Commission staff member who had contacted the State office in February was told to contact the University of Tennessee in order to obtain the results most

expeditiously. On February 11, 1991, a Planning Commission staff member called the University of Tennessee and was informed that the Commission could get the data most quickly on magnetic tape. However, the university would have to translate the data into a different format and separate the Davidson County information before the Planning Commission could use it.

On March 15, 1991, the Planning Commission staff obtained the 1990 census data on magnetic tape from the Center for Business and Economic Research of the University of Tennessee at Knoxville.

The 1990 census figures for Davidson County revealed a total population of 510,781, of which 381,737 are white and 129,044 are non-white. In other words, 74.7 percent are white and 25.3 percent are non-white. Black persons constitute 92 percent of the non-white population. According to the 1990 census, the councilmanic districts as presently drawn have significant imbalances of population. For example, the Seventeenth Councilmanic District has a population of 9,959, while the Thirteenth Councilmanic District has a population of 27,439.

When the 1990 census data is applied to the existing councilmanic districts, seven single-member districts have a majority of non-whites: district two is 83.7 percent non-white; district five is 81.1 percent non-white; district sixteen is 55.7 percent non-white; district seventeen is 73.6 percent non-white; district nineteen is 68.9 percent non-white; district twenty is 90.3 percent non-white; and district twenty-one is 88.4 percent non-white. Of those seven districts, six are represented by black Council members, while one, district sixteen, is represented by a white Council member.

On April 3, 1991, the plaintiffs, through counsel, wrote to the Metropolitan Legal Director, advising her that, if a reapportionment plan was not developed in sufficient time for the August 1991 councilmanic elections, then the plaintiffs would institute legal proceedings to compel the Coun-

---

**5.** Other criteria generally instructed the staff to use natural features when constructing boundaries, to avoid crossing the Cumberland River, if possible, to attempt not to place any independent city in more than one district and to respect existing districts to the extent possible.

cil to reapportion before the August 1991 elections. Copies of this letter were sent to the Planning Commission.

In the process of completing the reapportionment plan, the Planning Commission produced at least twelve computer-generated maps.[6] One of these maps was selected and, on April 23, 1991, the Planning Commission staff held a briefing session in which it presented its plan to the Council and the public. The staff recommendation was developed without consulting the public or Council members, other than Council member John Summers, who is also a member of the Planning Commission.

This plan placed two incumbent white Council members in the same district and two incumbent black Council members in the same district. (Messrs. Johns and Odom, both white, in district twenty-four, and Messrs. McAllister and Wallace, both black, in district twenty-one). On April 25, 1991,[7] this plan was presented to the Planning Commission for approval as the reapportionment plan, pursuant to section 18.06 of the Metropolitan Charter. At this meeting, the staff's recommended plan was amended by the Planning Commission. One amendment redrew the line between districts twenty-three and twenty-four so that the two white Council members, Mr. Johns and Mr. Odom, were no longer in the same district. The Planning Commission did not modify the plan to accommodate a similar request by Councilman Wallace. The staff stated to the Commission that the requested modification would breach the natural boundary of the Cumberland River, violate the "one person, one vote" principle and impact the district's racial character.

Mr. Palm testified that in order to solve the Odom/Johns problem, only one district line had to be moved. The McAllister/Wallace problem was more complex because it involved three districts and because numerous lines would have to be moved to meet the population requirements. He testified

that an important criteria was to maintain the integrity of neighborhoods, if possible.

The staff, in presenting the plan to the Planning Commission, excluded from the population of Davidson County approximately 2,873 persons incarcerated in the various penal institutions in Davidson County. According to Susan Mattson, employed by the Tennessee Department of Corrections as Assistant to the Commissioner for Planning and Research, there are 257 state inmates incarcerated in Metropolitan Nashville who are statutorily eligible to vote.

The reapportionment plan, as amended and adopted by the Planning Commission, subsequently was filed with the Metropolitan Council on April 30, 1991, and became Ordinance No. 91–1600. The Council, at its May 7, 1991, meeting, the first meeting after the plan had been filed, deferred first reading of the reapportionment plan to its May 21, 1991, meeting. This was at the request of plaintiff Wallace.

On May 21, 1991, the Metropolitan Council met in regular session and passed Ordinance No. 91–1600 on first reading. The Council met in special session on June 3, 1991, and voted against the ordinance.

The boundaries of the thirty-five single-member districts are specified in Appendix Two of the Metropolitan Charter. These boundaries were last changed on October 6, 1981, as the result of the adoption of Ordinance No. 81–701. Section 18.06 of the Charter requires that the Metropolitan Planning Commission propose a revision to these boundaries within six months of the receipt of the data from each decennial federal census, if such data reflects that the districts are malapportioned. The boundaries of the districts for the elected school board members must be similarly modified.

---

6. The census data was organized based on census block boundaries, which were the smallest units of information provided by the Census Bureau. The precinct or district units were too large to work with, according to the Planning Commission staff.

7. At the Planning Commission meeting of April 25, 1991, Chairperson Bush and members Summers, Vance, Fischer, Dugger, Baker, McKissack, Smith and Mayor Boner were present. Ms. McKissack was the only black member of the Commission.

The Metropolitan Council is then required to either approve or disapprove the redistricting plan by ordinance, which must be adopted on three separate days by a majority of the members of the Council. If the plan is disapproved, the Council may submit the redistricting plan to the voters for their approval at a referendum to be held within ninety days. The Council may submit its own redistricting plan to the voters at this referendum as an alternative to the redistricting plan proposed by the Planning Commission. If the Council does not approve the redistricting plan submitted by the Planning Commission or call for a special referendum election, Council members are deprived of their salaries until they take one action or the other.

### III.

■ The plaintiffs have brought this action challenging the apportionment of the thirty-five Metropolitan Council districts on the ground that the recently released 1990 decennial federal census data has revealed that the districts that were established in 1981 no longer conform to the "one person, one vote" requirements of the United States Constitution, the Voting Rights Act of 1965, as amended, the Tennessee Constitution, state law and the Metropolitan Charter. The plaintiffs also contend that The Metropolitan Government is diluting minority voting strength in violation of the United States Constitution, the Voting Rights Act and the Tennessee Constitution.

Originally, the plaintiffs sought to enjoin the August 1, 1991, elections because of the potential that The Metropolitan Government would adopt Ordinance No. 91–1600. However, the Council subsequently rejected that ordinance. Thereafter, during the hearing on this matter, the plaintiffs conceded that their challenge to Ordinance No. 91–1600 is not ripe for adjudication, since the Council rejected it. The plaintiffs still contend that the August 1, 1991, elections should be enjoined because the current Council districts are malapportioned.

The Metropolitan Government maintains that this action is not ripe for review because it has yet to conclude redistricting of the Council and no reapportionment plan has been adopted. The current status of the process is that the rejected Planning Commission reapportionment plan, Ordinance No. 91–1600, and possibly a plan proposed by the Council, will go before the voters in a referendum election. The defendant contends that the validity of a redistricting plan cannot be determined until one is adopted by referendum. The defendant asserts that, until that process is completed, any claims based on a proposed redistricting plan are clearly not ripe. The plaintiffs have conceded this with regard to Ordinance No. 91–1600.

In order for the federal courts to have jurisdiction over a case, the plaintiff must allege an actual case or controversy. *O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 674–75, 38 L.Ed.2d 674, 682 (1974); *Brown v. Ferro Corp.,* 763 F.2d 798, 801 (6th Cir.), *cert. denied,* 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). "Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675, 38 L.Ed.2d at 682 (citation omitted); *Brown,* 763 F.2d at 801; *see also City Communications, Inc. v. City of Detroit,* 888 F.2d 1081, 1089 (6th Cir.1989). "The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all the circumstances." *Brown,* 763 F.2d at 801.

The plaintiffs allege that allowing the August 1, 1991, elections to take place under the currently malapportioned Council districts will result in a denial of their fundamental rights to equal protection of the laws. However, the Supreme Court of the United States in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), on facts similar to the present situation, specifically stated that, under certain

circumstances, elections can go forward under a malapportioned plan.

> Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. *However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid.* In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

*Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1393–94, 12 L.Ed.2d at 541 (emphasis added).[8]

Further, the Court in *Reynolds* recognized that decennial reapportionment would comply with the Equal Protection clause, even if there was a population imbalance at the end of the decennial period.

> Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth.... Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, *although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period* and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

*Reynolds,* 377 U.S. at 583–84, 84 S.Ct. at 1392–93, 12 L.Ed.2d at 539–40 (emphasis added).

The circumstances under which the *Reynolds* Court found it permissible to hold elections, even though the districts were malapportioned, are present in this action. The impending general elections are imminent, and the election machinery is already in progress. The candidates have qualified and are campaigning, the voters are preparing to make their choices and the

---

**8.** Following *Reynolds,* other courts have withheld immediate injunctive or other equitable relief that would have affected an impending election. *See Chisom v. Roemer,* 853 F.2d 1186, 1192 (5th Cir.1988); *Simkins v. Gressette,* 631 F.2d 287, 295–96 (4th Cir.1980); *Maryland Citizens for a Representative Gen. Assembly v. Governor of Md.,* 429 F.2d 606, 609–11 (4th Cir. 1970); *Banks v. Bd. of Educ. of Peoria, School Dist. No. 150,* 659 F.Supp. 394, 398–403 (C.D.Ill. 1987); *Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1361–63 (M.D.Ala.1986); *MacGovern v. Connolly,* 637 F.Supp. 111, 115–16 (D.Mass.

1986); *Knox v. Milwaukee County Bd. of Election Comm'rs,* 581 F.Supp. 399, 405 (E.D.Wis. 1984); *Martin v. Venables,* 401 F.Supp. 611, 620–21 (D.Conn.1975); *Dobson v. Mayor and City Council of Baltimore City,* 330 F.Supp. 1290, 1299–1302 (D.Md.1971).

The plaintiffs attempted to distinguish many of these cases on their facts. Of course, the holding of each case will turn on its own set of unique facts. However, the Court finds persuasive the fact that these courts specifically dealt with the effect of an impending election on the imposition of relief.

election staff is readying the precincts. The Supreme Court has stated that these are valid considerations in this type of situation.

Although the plaintiffs maintain that the Planning Commission and Council acted in a lackadaisical manner and unreasonably delayed the redistricting process, the Court disagrees. The greater weight of the proof demonstrated that the Planning Commission used due diligence and proceeded in a reasonable and orderly manner to produce a redistricting plan. The Planning Commission received the 1990 census data on March 15, 1991, and it has complied with all the requirements and deadlines set forth in the Metropolitan Charter.

The plaintiffs assert that the test of reasonableness was established in 1971, when a redistricting plan was proposed and adopted in a shorter time period. In light of the new requirements brought about by the 1982 amendment to the Voting Rights Act of 1965,[9] among other things, the Court is unpersuaded that the 1991 process should be judged by the standard of the 1971 process. Fairly apportioning Council districts pursuant to the many constitutional requirements is a time-consuming and sensitive process. It should not be unduly rushed at the risk of imprudent decision-making.

The Metropolitan Council districts were last apportioned in October 1981. The Supreme Court in *Reynolds* stated that there is no constitutional violation based upon apportionment until the government has had an "adequate opportunity" after receiving the latest census data to adopt a new redistricting plan and failed. According to *Reynolds*, reapportionment must occur at least every ten years or it becomes "constitutionally suspect." Therefore, The Metropolitan Government has until October

1991 to adopt a new redistricting plan. Prior to that time, the Court will not predetermine whether a violation has occurred.

The Court notes that the Supreme Court in *Reynolds* also stated an important principle of federalism: "[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and ... judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds*, 377 U.S. at 586, 84 S.Ct. at 1394, 12 L.Ed.2d at 541. "The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411, 417 (1978).

■ Injunctive relief is one of the most powerful tools available to a court. The Court should not abandon its prudential concerns about exercising its powers until convinced that a certain course of action is necessary and appropriate.

The Court recognizes the serious imbalances in the existing Council districts.[10] However, The Metropolitan Government must be given an "adequate opportunity" to adopt a redistricting plan before judicial intervention is proper. The fact that the Metropolitan Charter requires general elections to be held in August is inopportune. The Court is bound to follow precedent and allow the government to redistrict within the ten-year time period, which ends in October. The Court may intervene only if and when The Metropolitan Government has failed in its attempts to redistrict within the ten-year period.

---

**9.** "Congress redefined the scope of section 2 of the Act to forbid not only those voting practices directly prohibited by the Fifteenth Amendment but also any practice 'imposed or applied ... in a manner which *results* in a denial or abridgement of the right ... to vote on account of race or color....'" *United States v. Marengo County Com'n,* 731 F.2d 1546, 1553 (11th Cir.1984) (citing 42 U.S.C.A. § 1973(a) (emphasis added)).

**10.** The Court notes the wide disparities present in the existing Council districts and the fact that these figures are far above any deviations ever upheld by the Supreme Court of the United States. However, the Court does not decide the constitutionality of allowing representation based on the existing malapportionment to continue until the next Metropolitan general elections in 1995.

## IV.

Ripeness is a threshold question. Since the issue of reapportionment is now proceeding to the voters of The Metropolitan Government, judicial intervention is premature. Simply put, the present action fails the test of the ripeness doctrine.

Accordingly, the defendant's motion to dismiss is granted and the plaintiffs' application for preliminary injunction is moot.

An appropriate order will be entered.