*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0485p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KATHLEEN PFAHLER; R. DEAN STRINE; GARY L.
RAMSEY; THERESA DEVAN,

　　　　　　　　*Plaintiffs-Appellants/*
　　　　　　　　*Cross-Appellees,*

　　　　*v.*

NATIONAL LATEX PRODUCTS COMPANY; H. ROSS
GILL, III; HARRY R. GILL, JR.; PATRICIA R. GILL;
GENERAL ELECTRIC CAPITAL CORPORATION,

　　　　　　　　*Defendants-Appellees/*
　　　　　　　　*Cross-Appellees,*

GLASS & ASSOCIATES, INC.; JAY P. AUWERTER, JR.,
　　　　　　　　*Defendants-Appellees/*
　　　　　　　　*Cross-Appellants.*

Nos. 06-3677/3678

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01446—Lesley Brooks Wells, District Judge.

Argued: September 11, 2007

Decided and Filed: December 14, 2007

Before: GUY, ROGERS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert S. Belovich, Parma, Ohio, for Appellants. Gary A. Piper, BARAN, PIPER, TARKOWSKY, FITZGERALD & THEIS, Mansfield, Ohio, Andrew J. Dorman, JANIK & DORMAN, Cleveland, Ohio, Ari H. Jaffe, KOHRMAN, JACKSON & KRANTZ, Cleveland, Ohio, for Appellees. G. William Scott, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Robert S. Belovich, Parma, Ohio, Anand N. Misra, Beachwood, Ohio, for Appellants. Gary A. Piper, BARAN, PIPER, TARKOWSKY, FITZGERALD & THEIS, Mansfield, Ohio, Mark A. Van Dyne, BARAN, PIPER, TARKOWSKY, FITZGERALD & THEIS, Lima, Ohio, Ellyn Tamulewicz Mehendale, JANIK & DORMAN, Cleveland, Ohio, Ari H. Jaffe, KOHRMAN, JACKSON & KRANTZ, Cleveland, Ohio, for Appellees. G. William Scott, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

1

---

**OPINION**

---

ROGERS, Circuit Judge.  Plaintiffs are former employees of the National Latex Products Company ("NLP") and former participants in and beneficiaries of the National Latex Products Company Employee Welfare Benefit Plan ("Plan").  They brought suit under § 502(a)(2) and § 502(a)(3) of the Employee Retirement Income Security Act ("ERISA") against several parties after those parties allegedly breached fiduciary duties that they owed to the Plan.  Among the parties named as defendants to the suit were NLP; Ross Gill, the president and Chief Executive Officer ("CEO") of NLP; Glass & Associates, a business consultant to NLP; and Jay AuWerter, an agent for Glass & Associates.  The district court in this case concluded that genuine issues of material fact existed as to whether all of the above defendants breached fiduciary duties to the Plan.  The district court later concluded, however, that plaintiffs could not recover under either ERISA § 502(a)(2), which provides for derivative suits to remedy breaches of fiduciary duties, or ERISA § 502(a)(3), which allows for suits for "other appropriate equitable relief."  Accordingly, the court dismissed the claims under both provisions with prejudice.

The parties raise numerous issues on appeal, but the primary issues before this court are whether the district court erred in determining that although (1) there are genuine issues of material fact with respect to whether NLP, Ross Gill, Glass & Associates, and AuWerter breached any fiduciary duties to the Plan and could consequently be held liable under §§ 502(a)(2) or (a)(3); (2) plaintiffs were barred from bringing suit under § 502(a)(2) because they sought to recover individually, rather than on behalf of the Plan; (3) plaintiffs could not bring an action under § 502(a)(3) because they sought money damages, as opposed to equitable relief; and (4) plaintiffs also could not bring suit under § 502(a)(3) because of their failure to comply with Federal Rule of Civil Procedure 23, which governs class action certification.

We reverse because plaintiffs are permitted to seek relief from NLP, Ross Gill, Glass & Associates and AuWerter pursuant to § 502(a)(2).  In light of this conclusion with respect to § 502(a)(2), plaintiffs are precluded from also obtaining relief under § 502(a)(3).  Because of this resolution of the second issue, we need not address the third and fourth issues decided by the district court.

I.

NLP was a latex balloon and ball manufacturing company located in Ashland, Ohio.  Members of the Gill family owned and operated NLP.  Harry R. Gill, Jr. served as chairman of the board of directors; his wife, Patricia R. Gill, was a board member; and his son, H. Ross Gill III, was president, CEO, and also a board member.

NLP began to experience serious financial difficulties in the mid-1990s, and by December 1998 it was forced to seek outside financing from General Electric Capital Corporation ("GECC"), a lending company specializing in commercial loans.  GECC provided NLP with a revolving credit account as well as outright loans, the proceeds of which were to be used for refinancing indebtedness, working capital, and other general business uses.  In return, NLP granted GECC a security interest in all of its present and future assets and agreed to open a "lock box" account into which all of NLP's receivables were to be sent and held for repayment of the loans.

When it became evident that the financing arrangement was not solving NLP's financial problems, GECC requested that NLP retain a "turn around" consultant to assist with salvaging, or, if necessary, selling, the company.  NLP and GECC selected Glass to fill this position, with AuWerter serving as Glass's primary on-site agent.

Pursuant to the consulting agreement between Glass and NLP, Glass was to provide "professional management assistance" to NLP and was permitted to negotiate with various parties on NLP's behalf. The agreement also stated, however, that Glass had "no authority to legally bind [NLP] in any matter whatsoever," except as explicitly permitted elsewhere in the agreement, and similarly had no power to execute documents on NLP's behalf, absent written authorization from the NLP board. Finally, the agreement provided that NLP would indemnify Glass and its agents from claims resulting from Glass's "performance or non-performance under this Agreement, or [Glass's] present or future association with the affairs of [NLP]."

Upon assessing NLP's financial state, Glass and AuWerter, who took the title of NLP Executive Vice President, became increasingly involved in the management of NLP's day-to-day operations. With Glass and AuWerter taking on enhanced roles, the Gills sharply decreased their participation in NLP's affairs, and eventually even stopped receiving pay. The exact roles that the parties played in running the company beyond this are disputed. Ross Gill claims that his participation in the management of NLP was minimal once Glass became involved and that AuWerter essentially ran the company. According to his estimates, Ross Gill reported to the NLP offices once a week and even then for only a short period. Gill also testified that Glass and AuWerter had authority to terminate employees, functioned as NLP's Chief Financial Officer ("CFO"), managed NLP's medical benefits, and selected a new third-party administrator for the company's employee welfare plan. Glass and AuWerter paint a different picture. While AuWerter acknowledges that he took on significant responsibilities at NLP, he maintains that ultimate decision-making power remained with the Gills and that the Gills, including Ross, came into the NLP offices frequently. Moreover, AuWerter disputes that he ever formally assumed the position of CFO.

Despite efforts to revitalize the company, Glass ultimately concluded that NLP was unlikely to rebound financially and should consequently be sold. The Gills agreed, and, on December 6, 1999, Pioneer National Latex, Inc. purchased NLP for $4.25 million in an asset-purchase sale. The proceeds of this sale were used to pay off the secured loan from GECC. All NLP employees were terminated at this time.

Until its sale, NLP sponsored a self-insured welfare benefit plan to provide health care benefits to its employees. The Plan was funded by both employee and employer contributions. NLP employees contributed to the Plan via deductions from their paychecks.

Pursuant to Plan documents, the Plan's administrator was NLP's Human Resources Manager and the Plan's named fiduciary was NLP's CFO. Nancy Headley served as Human Resources Manager until her discharge in August 1999. NLP did not replace Headley, and thus, as the plan sponsor, NLP became the administrator by default. Similarly, Scott Arnold was CFO at NLP until July 1999, after which the position formally remained vacant. The NLP and Glass defendants each assert that the other assumed Arnold's responsibilities.

Great West Life & Annuity Insurance Company ("Great West") served as a third-party administrator for the Plan until September 1999. In this capacity, Great West was responsible for processing claims that were submitted by healthcare providers, paying those claims, and then seeking reimbursement for such payments from Plan assets. Effective September 1, 1999, Great West terminated its relationship with NLP due to NLP's alleged failure to fund the Plan. According to a subsequent letter sent by Great West, NLP was delinquent in its reimbursements in the amount of $162,273.

On September 22, 1999, AuWerter, writing under the title of Executive Vice President, sent a memorandum to NLP employees informing them that Stateline TPA had taken over as third-party administrator for the Plan. In the memorandum, AuWerter stated that "we have recently

encountered difficulty getting our health claims paid through our carrier, Great West." AuWerter advised employees, however, that their health benefits would not be altered as a result of the switch to Stateline, writing "***your medical, prescription drug and dental benefits are not changing***" and that "all claims that have recently been submitted to Great West for payment, but have not been paid, ***will be paid*** once those claims have been resubmitted." AuWerter repeated these pledges in a September 30, 1999 memorandum to NLP employees, in which he wrote "[p]lease be assured that, although we are changing carriers, your group benefit plan coverage remains unchanged with the same entitlements . . . . Your weekly group benefit contribution that is deducted from your paycheck will remain the same."

On November 22, 1999, NLP transferred $230,091 into a trust account created by Stateline for the payment of claims. NLP employees continued to contribute to the Plan via payroll deductions during this period. There are no records showing that these employee contributions were ever sent to the Plan or held in trust.

When NLP was sold on December 6, 1999, $87,000 remained in the trust account. Stateline determined in early 2000 that the funds in the trust account were insufficient to cover all of the claims submitted prior to the sale of NLP. Accordingly, Stateline notified NLP employees that their benefits were denied due to inadequate funding and advised them to contact the Plan's administrator. According to a report prepared by Stateline's Chief Operating Officer ("COO"), NLP owed Stateline $312,072 in reimbursements.

## II.

Plaintiffs are Kathleen Pfahler, R. Dean Strine, Gary Ramsey, and Theresa DeVan. They initially filed suit against NLP, Harry Gill, Ross Gill, Patricia Gill, Glass, AuWerter, and GECC in the Ashland Court of Common Pleas, seeking to recover unpaid wages and fringe benefits under Ohio law. Upon motion by NLP and the Gills (the "NLP defendants"), the case was removed to federal district court on July 25, 2002, on the basis of federal preemption under ERISA. After the denial of their motion to remand the case to state court, plaintiffs amended their complaint to assert an ERISA derivative action on behalf of the Plan. Specifically, plaintiffs' amended complaint alleged that defendants conspired to, and did in fact, breach fiduciaries duties owed to the Plan, and requested, among other things, the "restitution of all damages suffered by the Plan and its participants."

In response to plaintiffs' amended complaint, Glass and AuWerter (the "Glass defendants") filed a cross-claim against NLP for indemnification. The Glass defendants argued that, pursuant to the parties' consulting agreement, NLP was required to indemnify them for any liability arising out of their actions taken on NLP's behalf.

In February and March of 2004, the NLP defendants, the Glass defendants, and GECC each filed a separate motion for summary judgment on plaintiffs' claims. All defendants argued either that they were not fiduciaries of the Plan or, even if they were fiduciaries, they had not breached any duties to the Plan. The Glass defendants also moved for summary judgment on their indemnification cross-claim against NLP.

The district court ruled on defendants' summary judgment motions on April 22, 2005. The court adopted the magistrate judge's report and recommendations with "slight modifications." First, it held that neither Patricia Gill, Harry Gill, nor GECC was a fiduciary of the Plan, and that GECC was not otherwise liable to plaintiffs under ERISA § 502(a)(3), since plaintiffs offered no evidence that any misappropriated employee contributions were ever transferred to GECC. Accordingly, the district court granted summary judgment in favor of these parties. The district court denied summary judgment to NLP, Ross Gill, and the Glass defendants, however, holding that NLP was

a fiduciary of the Plan and that genuine issues of material fact existed as to whether Ross Gill and the Glass defendants were fiduciaries. With respect to this latter group of defendants who were denied summary judgment, the district court further held that the only potential breaches that these parties committed were the purported misuse of employee contributions to the Plan and the alleged misrepresentations made by AuWerter concerning the payment of employee health claims. In contrast, the district court held that the defendants did not breach their duties by failing to collect employer contributions because nothing obligated NLP to fund the Plan. Finally, the court concluded that the Glass defendants were not entitled to indemnification from NLP because any actions that they may have taken as fiduciaries would have exceeded the scope of the consulting agreement. Consequently, it dismissed the cross claim.

Contemporaneous with its ruling on defendants' summary judgment motions, the district court entered a separate order requesting additional briefing from the parties on the following issues:

> 1. Whether plaintiffs could bring a derivative claim on behalf of a defunct plan, given that any recovery for a breach of fiduciary duty claim brought on the Plan's behalf must go to the Plan.

> 2. What type of damages plaintiffs would be entitled to if successful, assuming that Plaintiffs could bring a derivative action on the Plan's behalf.

> 3. What would happen to the damages that plaintiffs receive, assuming that they could bring a derivative action on behalf of a defunct plan and assuming that they would prevail.

> 4. Whether plaintiffs were required to bring their breach of fiduciary duty claims as a class action and comply with Fed. R. Civ. P. 23 if they sought relief under ERISA § 502(a)(3).

> 5. What types of damages plaintiffs could recover if they prevailed on their individual claims for breach of fiduciary duty, given that only equitable relief is available for individual ERISA § 502(a)(3) actions.

On July 11, 2005, after receiving briefing on these questions, the district court issued a second opinion, granting judgment as a matter of law to all defendants. The district court first held that plaintiffs could not obtain relief under ERISA § 502(a)(2) because plaintiffs sought recovery individually instead of on the Plan's behalf. In so holding, the district court expressed doubt as to whether a plaintiff may obtain relief under § 502(a)(2) on behalf of a defunct plan. Because the court held that plaintiffs were not bringing a derivative action, it did not address the second and third questions above. With regard to the fourth question, the district court held that plaintiffs could not alternatively bring an action on behalf of all plan participants under ERISA § 502(a)(3), which permits non-derivative suits for "other appropriate equitable relief," without complying with the requirements for class action certification set forth in Fed. R. Civ. P. 23.[1] Finally, the district court held that plaintiffs also could not obtain damages under § 502(a)(3), because plaintiffs sought the recovery of unpaid benefits, which the court concluded was a legal, rather than equitable, remedy.

Plaintiffs filed a motion to alter or amend this judgment, which was denied by the district court. Plaintiffs appeal and the Glass defendants cross-appeal with respect to their cross-claim.

---

[1] Plaintiffs originally brought their case as a class action, and the district court gave plaintiffs until January 10, 2003 to file the class certification motion. On January 8, 2003, plaintiffs filed their motion to seek leave to file the amended complaint, and the claims were styled in the amended complaint as being on behalf of the plan.

III.

Plaintiffs seek to hold defendants liable under both ERISA § 502(a)(2) and § 502(a)(3) for allegedly breaching their fiduciary duties to the Plan. Because plaintiffs may bring suit pursuant to § 502(a)(2), we need not address the majority of their § 502(a)(3) claims.

## A. ERISA § 502(a)(2)

Plaintiffs are entitled to seek relief from NLP, Ross Gill, and the Glass defendants under § 502(a)(2) because plaintiffs seek recovery for the Plan and have established that factual disputes exist as to whether these parties breached their fiduciary duties. Section 502(a)(2) authorizes plan participants and beneficiaries to bring derivative actions against fiduciaries who violate ERISA § 409 by breaching their duties to a plan. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985). Pursuant to § 409, a breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . .." 29 U.S.C. § 1109.

### 1. Derivative Relief

Plaintiffs properly assert a claim under § 502(a)(2), as they seek to recover on behalf of the Plan, rather than individually. Because a § 502(a)(2) suit is a derivative action, a plaintiff bringing suit under this provision cannot obtain personal monetary relief, but must instead seek relief for the plan. *Mass. Mut. Life Ins. Co.*, 473 U.S. at 140*; Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007). At trial, the district court held that plaintiffs were not attempting to recover damages suffered by the Plan, as they purported, but were really trying to obtain the benefits and contributions which they believed that the Plan owed to them. In reaching this conclusion, the district court relied upon a statement in plaintiffs' amended complaint requesting relief to "make the plan participants whole" and relied upon the fact that the Plan is now defunct. With respect to the latter, the district court held that although the defunct nature of a plan "may not necessarily present an absolute obstacle to derivative actions," it made suspect plaintiffs' claim that they sought recovery for the Plan.

That plaintiffs do, indeed, aim to recover on behalf of the Plan is evident from their amended complaint and supplemental briefing to the district court. In their amended complaint, plaintiffs requested that the district court "find and declare that defendants breached their fiduciary duties under ERISA and *are liable to the Plan* and its participants and beneficiaries as a result" and accordingly "order restitution of all damages *suffered by the Plan* and its participants." (emphasis added). Although plaintiffs explicitly sought relief for "the Plan *and its participants*," they acknowledge on appeal that they are only attempting to recover on the Plan's behalf.

Similarly, in their supplemental briefing addressing the district court's query as to what types of damages they would be entitled to receive if successful, plaintiffs unambiguously stated that "*the Plan is entitled* to relief from breaching fiduciaries" (emphasis added). Despite suggestions made by the district court to the contrary, nowhere in this section of their briefing did plaintiffs make mention of individual recovery. To rely on plaintiffs' purported statement that they sought relief "to make the plan participants whole" would be to take this statement out of context. The full quotation from plaintiffs' supplemental briefing is:

> The plaintiffs submit that under ERISA Section 502(a)(2) when a breach of fiduciary duty is proven, then *the Plan is entitled to relief from the breaching fiduciaries, sufficient to make the plan participants whole.* Section 502(a)(2) also requires under these circumstances that the Plan be operated under the supervision of a court appointed trustee to its conclusion.

(Emphasis added.) When viewed in its entirety, this passage clearly indicates that plaintiffs intend recovery to go to the Plan. The phrase "to make the participants whole" does not suggest otherwise, as it merely states a measure of the damages that defendants caused to the Plan (i.e., making participants whole would require the Plan to be funded with the contributions that were allegedly withheld by the fiduciaries in breach of their duties).

Defendants argue that it is evident from the nature of the claimed fiduciary breaches that plaintiffs are seeking individual relief, not relief for the Plan. This is not true. First, a claim based on the purported material misrepresentations of fiduciaries is a classic breach-of-fiduciary-duty claim under ERISA. The Supreme Court has, for instance, stated that "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (quoting ERISA § 404(a)). Second, plaintiffs' claims that the fiduciaries neglected their duty to enforce the Plan's right to employee and employer contributions are also breach-of-fiduciary duty claims, since the relief for these purported breaches would inure to the benefit of the Plan, not plaintiffs.

Furthermore, the fact that damages awarded to the Plan may provide plaintiffs with an indirect benefit, the payment of their claims, does not convert their derivative suit into an action for individual relief. As their amended complaint and supplemental briefing demonstrate, any recovery that plaintiffs receive individually will occur as a result of the Plan's paying out benefits. To hold that plaintiffs are barred from seeking relief pursuant to § 502(a)(2) merely because they may derive an indirect benefit from relief going to a plan would have the effect of precluding the vast majority of § 502(a)(2) suits. Such a rule would prevent all beneficiaries aside from those lacking any financial interest in a plan from bringing a § 502(a)(2) action. Without some sort of financial incentive, it is unlikely that these remaining parties would decide to bring suit on behalf of their plans.

Contrary to defendants' contentions, the instant case is distinguishable from cases in which this court has held that a plaintiff was seeking individual relief, a direct benefit, and therefore could not recover under § 502(a)(2). In denying § 502(a)(2) relief in all of those cases, however, this court relied on the fact that the plaintiffs there explicitly sought personal recovery. In *Bauer v. RBX Industries*, 368 F.3d 569, 582 n.6 (6th Cir. 2004), for example, this court held that plaintiffs' request for damages for breach of fiduciary duty would not survive a motion to dismiss because the desired recovery would be "payable to the Plaintiffs." Likewise, in *Tregoning v. American Community Mutual Insurance Co.*, 12 F.3d 79, 83 (6th Cir. 1993), this court dismissed plaintiffs' § 502(a)(2) claim where they expressly stated that the plan administrator was "personally liable *to plaintiffs* for their damages" (emphasis in *Tregoning* opinion). This court reached a similar result in *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1390 (6th Cir.1994), where plaintiffs alleged that a fiduciary breached duties owed directly to them and "[sought] recovery on their own behalf, not on behalf of the plan." In contrast, plaintiffs here have made clear that all recovery will inure to the Plan.

Finally, there is no good reason why a plaintiff cannot obtain § 502(a)(2) relief on behalf of a defunct plan. As noted, the district court stated that the defunct nature of the Plan cast serious doubt on plaintiffs' claim that they sought recovery for the Plan, although such status "may not necessarily present an absolute obstacle to derivative actions."

In construing a statute "our analysis begins with 'the language of the statute.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992)). Here, nothing in the plain language of § 502(a)(2) suggests that a plaintiff's ability to recover under that provision is contingent upon a plan's being active at the time of suit. That contention has been squarely rejected by the Fourth Circuit. *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 338-41 (4th Cir. 2007). The Fourth Circuit accurately

stated that "[i]t is perhaps a massive understatement to say that the plain language of ERISA § 502(a)(2) favors" allowing beneficiaries to bring an action on behalf of a defunct plan. *Id.* at 338. Nowhere does § 502(a)(2) qualify a beneficiary's ability to bring suit by stating, for example, that a beneficiary may only sue "until plan termination" or "before plan termination." *Id.* Rather, § 502(a)(2) merely states that "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109."

Moreover, permitting beneficiaries to bring suit to remedy fiduciary breaches even after a plan is defunct effectuates ERISA's underlying goals. One of the primary purposes of ERISA is

> to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b). The accomplishment of these goals would be significantly frustrated if a breaching fiduciary could escape liability merely by terminating a plan before a lawsuit is commenced or during its pendency. Because "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995), suits brought on behalf of defunct plans are necessary to ensure that fiduciaries adhere to established standards of conduct and that beneficiaries are not deprived of proper relief.

Defendants claim that plaintiffs should not be able to recover on behalf of a defunct plan because there is no plan to receive benefits if the plaintiffs are successful, making any relief granted personal, rather than derivative. The remedy proposed by plaintiffs and supported by the Secretary of Labor, however — the appointment of an independent fiduciary to hold any amounts recovered from defendants in trust — would ensure that all recovery went to the Plan and not to plaintiffs.

### 2. Breaches of Fiduciary Duties

The district court correctly determined that genuine issues of material fact exist as to whether Ross Gill, NLP, and the Glass defendants violated § 409 by breaching fiduciary duties that they owed to the Plan. Accordingly, these defendants were not entitled to summary judgment on such grounds.

First, there are, at a minimum, genuine factual disputes as to whether Ross Gill, NLP, and the Glass defendants owed fiduciary duties to the Plan. A party is a fiduciary, and consequently owes duties to an ERISA plan, if he falls under one of two statutory categories. The first category of ERISA fiduciaries are "named" fiduciaries, which are parties explicitly listed as fiduciaries in a plan instrument. 29 U.S.C. § 1102(a); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993). ERISA requires every plan to have at least one "named" fiduciary. § 1102(a). The second category of ERISA fiduciaries is that of "unnamed" fiduciaries. A party will be considered an "unnamed" fiduciary if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

§ 1002(21)(A).

At trial, the district court held that neither Patricia Gill, Harry Gill, nor GECC was a fiduciary of the Plan, but that NLP was a fiduciary and that genuine issues of material fact existed

as to whether Ross Gill and the Glass defendants were fiduciaries.  On appeal, plaintiffs do not argue that either Harry Gill, Patricia Gill, or GECC was a fiduciary, and NLP does not contest that it owed fiduciary duties to the Plan.  The Glass defendants and Ross Gill, however, challenge the district court's ruling that genuine factual issues exist with respect to their fiduciary status.

The district court did not err in holding that genuine issues of material fact exist as to whether Ross Gill and the Glass defendants were fiduciaries.  With respect to the Glass defendants, there is sufficient evidence in the record to suggest that they may have owed duties to the Plan as "named," or, in the alternative, "unnamed," fiduciaries.  In an August 1999 memorandum to GECC, AuWerter stated that Glass had assumed the CFO position at NLP on an interim basis.  In addition, both Scott Wallace, NLP's former controller, and Ross Gill testified that AuWerter took over as CFO.  Because Plan documents provide that NLP's CFO was its named fiduciary, the GECC memorandum and testimony of Wallace and Gill create a genuine factual dispute as to the Glass defendants' fiduciary status.

Further, the record also indicates that the Glass defendants may have had sufficient control over the Plan's management to be considered "unnamed" fiduciaries.  The record contains evidence that the Glass defendants may have negotiated a change of Plan benefits without input from the NLP board, had sole communication with Stateline and NLP personnel concerning the payment of claims, and authorized the payment of over $230,000 to Stateline for claims payments.  It is further undisputed that the Glass defendants, on at least two separate occasions, made representations to NLP employees regarding the nature of their benefits under the Plan. Such conduct demonstrates the type of discretionary control over plan assets and administration that conveys fiduciary status under ERISA.  Moreover, Ross Gill testified that the Glass defendants essentially ran NLP during the Fall of 1999; such authority would allow them considerable control over plan management given that NLP was the plan administrator.

The Glass defendants dispute the accuracy of these facts.  They contend that they neither acted as CFO nor had final decision-making power with respect to the Plan, since the Gills were still in charge of the company.  The question before this court is not, however, whether the Glass defendants were in fact fiduciaries, but merely whether a genuine issue of material fact exists with respect to this question.  Because there is sufficient evidence suggesting that the Glass defendants may be fiduciaries, even though the issue is disputed, a material issue of fact exists and summary judgment is thus improper.

Moreover, this court need not address whether Ross Gill was a fiduciary, as his failure to object to the magistrate judge's recommendations constituted a waiver of his ability to appeal the district court's ruling.  This court has repeatedly held that when a party is notified that it must object to a magistrate judge's report and it does not do so, the party "is deemed to waive review of the district court's adoption of the magistrate judge's recommendations." *Spencer v. Bouchard*, 449 F.3d 721, 724 (6th Cir. 2006); *see also Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999).  Here, the district court adopted the magistrate judge's conclusion that there were genuine issues of material fact with respect to the fiduciary status of Ross Gill because "no party . . . objected to the Magistrate Judge's conclusion."  In its report and recommendation addressing the NLP defendants' summary judgment motion, the magistrate judge included a conspicuous notice that the parties were required to file any objections within ten days and that "[f]ailure to file objections within the specified time waives the right to appeal the District Court's order."  Because Ross Gill chose not to file an objection despite clear notice of the need to do so, he is barred from raising this issue on appeal.

Second, genuine issues of material fact also exist as to whether NLP, Ross Gill and the Glass defendants breached duties that they may have owed to the Plan as fiduciaries.  "Under ERISA § 404, a fiduciary owes strict duties to a plan and its participants." *Bridges v. Am. Elec. Power Co.,*

*Inc.*, 498 F.3d 442, 444 (6th Cir. 2007).  Pursuant to this provision, a fiduciary must discharge his duties "solely in the interest of the participants and beneficiaries" and act with "the care, skill, prudence, and diligence . . . [of] a prudent man."  29 U.S.C. 1104(a)(1)(B)[2]; s*ee also Gregg v. Transp. Workers of Am. Int'l.*, 343 F.3d 833, 840-41 (6th Cir. 2003).  A fiduciary that fails to comply with these standards may be held personally liable to the plan under § 409 for any resulting losses.  *Bridges*, 498 F.3d at 444.  For a fiduciary to be held liable, however, he must have been acting in a fiduciary capacity when taking the challenged action. *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001).

Plaintiffs argued before the district court that the following actions constituted breaches of the defendants' fiduciary duties: 1) the making of misrepresentations to plan participants concerning the status of unpaid claims; 2) the alleged misappropriation of employee contributions to the Plan; and 3) the failure to collect employer contributions to the Plan.  The district court concluded that genuine issues of material fact existed with respect to whether the first two actions constituted breaches.  As to the third, however, the district court determined that defendants' failure to collect employer contributions to the Plan was not a breach of their fiduciary duties and that summary judgment was thus proper.

The district court was correct with respect to all three alleged breaches.  Genuine issues of material fact exist as to whether the Glass defendants breached their fiduciary duties by making material misrepresentations to plan participants concerning the payment of claims.  "A fiduciary breaches his duties by providing plan participants with materially misleading information," even when he does so negligently, rather than intentionally. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002).  To establish a breach of fiduciary duty claim based upon misrepresentations regarding coverage under an ERISA plan, a plaintiff must show:

> (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to [his] detriment.

*Id.*

With respect to the second element, there are genuine issues of material fact as to whether statements made by AuWerter in memoranda to NLP employees constituted material misrepresentations.  In a September 22, 1999 memorandum, AuWerter told NLP employees that the company had "encountered difficulty getting our health claims paid through . . . Great West" and that "after several weeks of trying to resolve our differences with Great West, but making no progress, we have decided to change carriers."  AuWerter advised employees, however that "***your medical, prescription drug and dental benefits are not changing***" and that "all claims that have recently been submitted to Great West for payment, but have not been paid, ***will be paid*** once those claims have been resubmitted to our new network provider."  AuWerter provided similar assurances in a September 30, 1999 memorandum to NLP employees, in which he stated "[p]lease be assured that, although we are changing carriers, your group benefit plan coverage remains unchanged with the same entitlements . . . Your weekly group benefit contribution that is deducted from your paycheck will remain the same."

A reasonable juror could conclude that several of these representations were materially misleading when made.  AuWerter's assurance that all claims would be paid could be found to be deceptive in light of NLP's financial woes.  At the time that he made this statement, Great West had

---

[2] In relevant part, § 404 provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

already terminated its relationship with NLP because of NLP's inability to fund the Plan properly. Moreover, in an August 27, 1999 memorandum to GECC, Glass expressed a belief that NLP's finances were not likely to improve. Given AuWerter's knowledge and beliefs, a reasonable juror could find that it was deceitful for him to state unequivocally that all claims would be paid. The insinuation that claims processing problems were the fault of Great West could similarly be found to be misleading based on these facts. Finally, because the record suggests that Great West ended its relationship with NLP, there are factual disputes concerning the truthfulness of AuWerter's statement in the September 22 memorandum that NLP initiated the change in claims administrators.[3]

Although plaintiffs offer no direct proof that the Glass defendants knew that these statements were misleading, a jury could reasonably infer such awareness from other evidence in the record. In a letter to AuWerter dated October 26, 1999, Great West stated that it had "previously informed [him] that [NLP] failed to pay the amounts owed . . . [and that this breach] necessitated the automatic termination of the contractual relationship on or about September 1, 1999." From this letter, a reasonable jury could conclude that, at the time that AuWerter sent the memoranda to NLP employees, he knew or should have known that NLP was having difficulty funding the Plan and that Great West was in fact the party that terminated the relationship.

Further, there is evidence from which a reasonable juror could find that any misrepresentations were material and were relied upon by plaintiffs. A misrepresentation will be deemed material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." *Id.* (quotation omitted). A promise that all claims would be paid would plainly affect a beneficiary's decision as to whether to seek health care. Had plaintiffs been aware of the possibility of their benefits' being denied, they likely would have forgone some procedures.

Issues of fact also exist regarding whether the Glass defendants were acting in a fiduciary capacity at the time that they made the above misrepresentations. In *Varity Corp. v. Howe*, 516 U.S. at 502, the Supreme Court held that "[c]onveying information about the likely future of plan benefits . . . would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose." *See also id.* at 505 ("[M]aking intentional representations about the future of plan benefits . . . [in the context of that case] is an act of plan administration."). In *Varity*, the Supreme Court concluded that an employer-fiduciary was acting as a fiduciary when it made misrepresentations about benefits to employee-participants, because of the context of the statements, "the plan related nature of the activity," and the fact that the statements were made by one with authority to speak on the matter. *Id.* at 503. Here, AuWerter's statements were made in a memorandum that exclusively discussed Plan benefits and, as discussed, there is a factual issue as to whether AuWerter was authorized to make these statements. Thus, under *Varity*, a genuine issue of material fact exists.

There are also disputed issues of material fact with respect to the second alleged breach, the purported misappropriation of employee contributions to the Plan. As noted, plan fiduciaries have a broad obligation to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). In accordance with this duty, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants . . . and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

---

[3] The Glass defendants argue on appeal that plaintiffs conceded in deposition testimony that the memoranda did not contain misrepresentations and cannot now claim the opposite. Because defendants did not present this argument to the district court, however, we decline to address it. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("It is well-settled that this court will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice.")

The district court determined that factual questions exist as to whether defendants misused employee contributions by allowing those funds to be used for the benefit of NLP. The court noted that it was unclear whether the $230,091 transferred to Stateline on November 22, 1999 included all employee contributions made up to that point, and that there was no evidence that any employee contributions made between November 22, 1999 and December 6, 1999, the date on which NLP was sold, were ever held in trust for the Plan.

There is at least a genuine issue of material fact as to whether the contributions made during the relevant time period were plan assets. The term "plan asset" is not defined in the statute. Department of Labor regulations, however, provide that "the assets of the plan include amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan." 29 C.F.R. § 2510.3-102(a). Contributions may be considered assets "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." *Id.* By regulation, a reasonable time for the segregation of employee contributions to welfare benefit plans may not exceed 90 days from the date on which the employer receives the contributions. § 2510.3-102(d). Because NLP was both the employer and plan administrator as of August 1999, a relatively short period should have been needed to transmit the funds.

There are also factual disputes with respect to whether defendants used these employee contributions to benefit parties other than Plan participants. Without any evidence that the contributions were segregated and held in trust for the Plan, a jury could reasonably find that these funds were in fact used for NLP's benefit.

The Glass defendants argue that they had no control over the processing of employee contributions and therefore had no fiduciary duties with respect to this activity. This argument fails at this stage of the litigation, as there is adequate evidence in the record to suggest that they had some authority over the process. At the time of the alleged misappropriations, NLP was listed as plan administrator and would have had control over the handling of contributions. Because there is testimony that AuWerter essentially ran NLP at this time, a reasonable jury could conclude that the Glass defendants had control over employee contributions and accordingly had duties to ensure that those funds were used to benefit the Plan.

Finally, in contrast, defendants did not breach their fiduciary duties by failing to collect employer contributions because the employer, NLP, was not obligated to fund the Plan. One of the duties that ERISA imposes upon fiduciaries is to take action to ensure that "a plan receives all funds to which it is entitled." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985). "ERISA does not," however, "create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits." *Curtiss-Wright Corp.*, 514 U.S. at 78. "Nor does ERISA establish any minimum participation, vesting or funding requirements for welfare plans." *Id.* Because ERISA does not require an employer to fund a plan, a plan fiduciary "is not duty-bound to bring suit to collect contributions from an employer unless an employer is bound contractually to . . . make those contributions." *See Bagsby v. Cent. States, Se. & Sw. Areas Pension Fund*, 162 F.3d 424, 431 (6th Cir. 1998). The district court concluded that NLP was not required under Plan documents to contribute to the Plan and that the fiduciaries were consequently not required to collect delinquent employer contributions. Plaintiffs concede that NLP had no fiduciary duty to fund the Plan, but argue on appeal that NLP contractually obligated itself to do so. Thus, they assert that the fiduciaries breached their duties by not enforcing the Plan's contractual rights after NLP neglected to properly fund the Plan in the Fall of 1999.

The district court properly determined that NLP did not obligate itself to fund the Plan. Nothing in the record indicates that NLP was contractually bound to contribute specific amounts to the Plan. The Plan Document and Summary Description discuss the funding of the Plan in two

sections. First, in a section entitled "Eligibility, Funding, Effective Date and Termination Provisions," the document states:

> The National Latex Products Company shares the cost of Employee and Dependent coverage under this Plan with the covered Employees . . . The level of *any* Employee contributions is set by the Plan Administrator. The Plan Administrator reserves the right to change the level of Employee contributions.

(Emphasis added.) The document provides essentially the same in a later section, titled "Responsibilities for Plan Administration":

> **Funding the Plan and Payment of Benefits**
>
> The cost of the Plan is funded as follows:
>
> **For Employee and Dependent Coverage:** Funding is derived from the funds of the Employer and contributions made by the covered Employees.
>
> The level of any Employee contributions will be set by the Plan Administrator. These Employee contributions will be used in funding the cost of the Plan as soon as practicable after they have been received from the Employee or withheld from the Employee's pay through payroll deduction.

As the district court explained with respect to the latter provision, although the explanation is applicable to both, "this generic provision simply explains that the plan is funded both through employee and employer contributions, it hardly establishes that unpaid employer contributions are Plan assets or obligates the employers to make contributions so as to vest the unpaid contributions in the Plan" (quotations omitted). In other words, these provisions simply do not amount to promises by NLP to contribute any amount of money to the Plan.

Plaintiffs argue that even if the Plan documents did not require NLP to fund the Plan, NLP became bound to do so because of AuWerter's alleged misrepresentations regarding the payment of claims. Relying on *Local Union 2134, UMW of Am. v. Powhatan Fuel*, 828 F.2d 710 (11th Cir. 1987), plaintiffs assert that where an employer makes misrepresentations concerning the continuation of plan benefits, and plan beneficiaries detrimentally rely upon those statements, the employer becomes obligated to fund the plan to ensure that such benefits are provided. *Powhatan Fuel*, however, does not support that conclusion. That case simply recognized that a fiduciary breaches his duties to a plan, and may thus be held personally liable, by making misrepresentations with respect to plan coverage. Nowhere does *Powhatan Fuel* state, or even imply, that duties to fund a plan spring up when an employer makes such misrepresentations and plaintiffs point to no other authority so holding.

### *B. ERISA § 502(a)(3)*

Although plaintiffs may proceed with their § 502(a)(2) claims, they cannot seek relief under ERISA § 502(a)(3). Because plaintiffs are entitled to seek relief under § 502(a)(2) from NLP, Ross Gill, and the Glass defendants for their alleged fiduciary breaches, as explained above, plaintiffs cannot bring suit for these same actions under § 502(a)(3). Section 502(a)(3) is a catch-all provision which permits individual beneficiaries to bring suit for equitable relief.[4] *Varity*, 516 U.S. at 512.

---

[4] "A civil action may be brought" under this provision

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

The applicability of § 502(a)(3) is generally limited "to beneficiaries who may not avail themselves of § [502]'s other remedies." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998) (citing *Varity*, 516 U.S. at 512). It is true that in cases such as *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 838-42 (6th Cir. 2007), we have held that a plaintiff could simultaneously obtain relief under § 502(a)(1)(B) and § 502(a)(3), but only because recovery under the former would not provide adequate relief. Here, plaintiffs themselves state that they "believe that they have a complete remedy available under § 502(a)(2)." Since plaintiffs cannot bring suit under § 502(a)(3) for the reason stated, we do not need to decide whether the district court properly determined that § 502(a)(3) was not applicable because the plaintiffs sought money damages instead of equitable relief and because they failed to comply with Federal Rule of Civil Procedure 23, which governs class action certification.

In addition to relief sought for breaches of fiduciary duties, plaintiffs seek to hold GECC liable as a non-fiduciary and to have a constructive trust imposed upon Plan assets that NLP purportedly transferred to GECC pursuant to the parties' "lock-box" arrangement. Plaintiffs also cannot obtain relief under § 502(a)(3) from GECC as a non-fiduciary because there is no evidence in the record suggesting that GECC ever held misappropriated Plan assets in their "lock-box" account. We recognize that a plan participant may, in certain circumstances, bring suit against a non-fiduciary that knowingly engages in a prohibited transaction. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245-49 (2000). Where Plan assets are wrongfully transferred to a non-fiduciary "party in interest," a court may impose a constructive trust on the property in favor of the plan and its beneficiaries. *Id.* at 250-53. "An action for restitution against a transferee of tainted plan assets" is "appropriate equitable relief" within the meaning of § 502(a)(3). *Id.* at 253.

Such a constructive trust is not appropriate here, however, because plaintiffs have not created a genuine issue of material fact as to whether GECC possessed employee contributions to the Plan. Although there is at least some evidence that employee contributions were not used for the benefit of the Plan, there is no proof that GECC ever received those funds in its "lock-box" account. Under the terms of the financing agreement between NLP and GECC, NLP was only required to transfer its customer receipts into the GECC "lock-box." Moreover, the agreement explicitly permitted NLP to maintain its own separate payroll checking account, into which it could deposit payroll deductions. In the testimony of GECC employee James DeSantis, he confirmed that the "lock-box" only swept up accounts receivable and would never have included payroll deductions for employee contributions to the Plan. Plaintiffs offer no evidence suggesting that funds from these two accounts were commingled or that employee contributions found their way into the "lock-box" through some other means. Moreover, even if GECC did receive misappropriated Plan assets, there is no evidence to suggest that it did so knowingly. *See McDannold v. Star Bank, N.A.*, 261 F.3d 478, 486 (6th Cir. 2001) (citing *Harris Trust*, 530 U.S. at 251). Given the absence of any such evidence, summary judgment was proper.

IV.

On the cross-appeal with respect to the Glass defendants' cross-claim against NLP, we reverse because the Glass defendants are entitled to indemnification from NLP under the terms of the parties' consulting agreement. In full, the indemnification provision of the consulting agreement provides:

> [NLP] shall and does forever release, remise and discharge, agree to indemnify, pay on demand and hold harmless Glass, its agents, attorneys, employees, and representatives, (the "Release[e]s"), for any and all claims, costs, demands, actions,

---

29 U.S.C. § 1132(a)(3).

> liabilities, judgments, or attorney fees which may result from any act or failure to act in what Releasees in good faith believe to be the best interests of the company arising out of Releasees' performance or non-performance under this agreement, or Releasees' present or future association with the affairs of [NLP], its creditors, stockholders, employees, agents, attorneys, or representatives.
>
> This release, indemnification and agreement to hold harmless extends to all claims of every nature and kind whatsoever, past, present or future, known or unknown, and suspected or unsuspected.

The district court held that, as a matter of law, the provision was either "irrelevant or inapplicable" to the Glass defendants' cross claim against NLP for indemnification, and accordingly dismissed the claim. Because Glass was hired to provide management consultation services[5] and the indemnification provision states that NLP would indemnify the Glass defendants for acts "arising out of Releasees' performance or non-performance under this Agreement," the court concluded that any actions that the Glass defendants took as fiduciaries were outside the scope of the indemnity provision. Specifically, the court held that the Glass defendants exceeded the scope of the consulting agreement by taking a more active role in the management of NLP's affairs and by purportedly exercising control over Plan "management, administration, or assets."

The indemnity clause, however, applies broadly enough to include the claims brought by plaintiffs in this case. In one clause of the indemnification provision, NLP promised to indemnify Glass for "[r]eleasees' present or future association with the affairs of [NLP] . . . [or its] employees." If read in conjunction with the rest of the language of the indemnification provision, this provision states that NLP agreed to indemnify the Glass defendants

> "from any and all claims . . . which may result from any act or failure to act in what Releasees in good faith believe to be the best interests of the company arising out of . . . Releasees' present or future association with the affairs of [NLP] its creditors, stockholders, employees, agents, attorneys or representatives."

If the Glass defendants were acting as fiduciaries and "in good faith believe[d]" that their actions were in "the best interests" of NLP, then the indemnification provision would apply, because any actions that the Glass defendants took arose out of their "present or future association with the affairs of [NLP] . . . [or its] employees." NLP presents no evidence that the Glass defendants did not believe, in good faith, that their conduct was in NLP's best interests.

Conditioning the applicability of the indemnity clause upon whether the Glass defendants acted as fiduciaries would force an unnatural restriction on the clause. If the parties had intended the indemnity provision to apply only to actions that the consultation agreement explicitly authorized the Glass defendants to take, it would only have been necessary to include the clause

---

[5] The consultation agreement listed Glass's responsibilities as follows:

1. <u>Services</u>. The Company hereby engages Glass for the purpose of providing management consultation services. Glass will provide William R. Ligon, Jay P. AuWerter and Shaun K. Donnellan as representative[s] of Glass to serve as Special Consultant[s] to the Board of Directors of Company subject to terms and conditions set forth herein. Glass may provide others from time to time as required during the course of the assignment.

2. <u>Limitation of Authority</u>. The relationship between Company and Glass created with respect to Glass is one of independent contractor, and Glass shall have no authority to legally bind Company in any matter whatsoever, except as specified herein. Glass may, in the performance of its duties, negotiate on behalf of Company with various parties, including but not limited to creditors, stockholders, and employees of Company, and government entities, but unless authorized in writing by the Board of Directors of Company, in no case shall Glass have any authority or be under any duty whatsoever to execute documents in the name of or on behalf of Company with respect to such negotiations or the transactions contemplated therein.

providing for a release for "performance or non-performance under this agreement." The inclusion of the clause that provides for indemnification with respect to the Glass defendants' "future association with the affairs of [NLP]," expands the scope of indemnification. To hold otherwise robs the latter clause of its plain meaning. *See Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1117 (6th Cir. 2001) (refusing to interpret an indemnification provision so as to make a clause "surplusage, in violation of contract construction").

NLP alternatively asserts that the indemnification provision is invalid pursuant to ERISA § 410(a). Under § 410(a), "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). This provision, however, merely "prohibits agreements that diminish the statutory obligations of a fiduciary." *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 161 (8th Cir. 1990); *see also IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418-19 (9th Cir. 1997). Indemnification agreements do not prevent a fiduciary from being held liable, but instead only provide that if the fiduciary is held liable, then someone else will compensate the fiduciary for that liability. Moreover, ERISA § 410(b) states that a fiduciary may purchase insurance to cover potential liability and that an employer may purchase insurance to cover potential liability of fiduciaries. § 1110(b)(2)-(3). Given that ERISA explicitly permits parties to insure against possible liability, it would be illogical to interpret the statute as prohibiting indemnification agreements, which accomplish the same thing.

This reading is consistent with the Secretary of Labor's interpretation of § 410(a), which is that this section "permit[s] indemnification agreements which do not relieve a fiduciary of responsibility or liability." 29 C.F.R. § 2509.75-4. The Secretary explains in the regulations that "[i]ndemnification provisions which leave the fiduciary fully responsible and liable, but merely permit another party to satisfy any liability incurred by the fiduciary in the same manner as insurance purchased under section 410(b)(3), are therefore not void under section 410(a)." *Id.*

V.

The Glass defendants' alternative argument that they are entitled to summary judgment on plaintiffs' claims because plaintiffs have not proven their damages to a reasonable certainty is without merit. Damages cannot be speculative, but this only means that the *fact* of damages, not their amount, cannot be uncertain. *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 289-91 (3d Cir. 1995). Because this case is at the summary judgment stage, the Glass defendants can only prevail if they demonstrate that there "is no genuine issue as to any material fact" with respect to whether the Plan suffered damages and that they are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Taking the facts in the light most favorable to them, *see Thomas v. Miller,* 489 F.3d 293, 297 (6th Cir. 2007), plaintiffs have demonstrated that there is a factual issue with respect to whether the Plan suffered damages and the amount of damages to which the Plan is entitled if plaintiffs are successful. Plaintiffs produced a report prepared by Brian Lewis, COO for Stateline, stating that NLP was liable for $32,787 for processed claims and $279,285 for unprocessed claims. The NLP Plan, therefore, suffered damages because it was underfunded. Moreover, as previously discussed, there are genuine issues of material fact as to whether employee contributions were paid to Stateline or held in trust. Summary judgment on this alternative ground is, therefore, not warranted.[6]

---

[6] The cases that the Glass defendants rely upon are distinguishable, as in those cases plaintiffs made no showing whatsoever that they suffered damages. *Brown v. Ferro Corp.*, 763 F.2d 798, 799 (6th Cir. 1985) involved a shareholder's derivative suit in which the shareholder sued, arguing that the adoption of "golden parachute" severance agreements violated the business judgment rule. The corporation had deposited money into an escrow account to fund these agreements, but had not had to pay on any agreements at the time that the shareholder sued. *Id.* at 799-800. This court held that the district court did not abuse its discretion by dismissing the shareholder's suit because the only

VI.

Finally, contrary to the argument of defendant AuWerter, plaintiffs' method of service was reasonably calculated to provide him with notice of the suit and thus comported with the requirements of due process. "The fundamental requisite of due process of law is the opportunity to be heard." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). To satisfy due process, service of process must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*; *see also Karkoukli's, Inc. v. Dohany*, 409 F.3d 279, 283 (6th Cir. 2005).

Notably, AuWerter does not contend that he lacked notice of the suit against him. According to the district court docket sheet, AuWerter has participated in this case ever since it was removed to federal court. He has filed an answer to plaintiffs' complaint, filed a cross-claim against NLP, and even moved the district court for dismissal on the ground of insufficient process pursuant to Federal Rule of Civil Procedure 12(b)(5) (an order that the district court denied).[7] AuWerter was plainly "apprised" and had "an opportunity to present [his] objections."

Rather, AuWerter argues that plaintiffs' attempt at service was not reasonably calculated to notify him of the lawsuit, even though it did so in fact. According to the uncontested facts in plaintiffs' motion in opposition to AuWerter's motion to dismiss: (1) plaintiffs first sent the complaint to AuWerter's business address by certified mail; (2) after "Glass refused service by certified mail," plaintiffs sent the complaint by regular mail; (3) the business address for Glass was the only business address for AuWerter and the address that AuWerter had given to NLP; (4) that address was "the only address referenced in every relevant document known to Plaintiffs at the time of service." These actions satisfy due process because it was reasonable for plaintiffs to believe that the actions would put AuWerter on notice that he was being sued. *See Trimble v. U.S. Dep't of Agric.*, 87 F. App'x 456, 457-58 (6th Cir. Dec. 10, 2003) (unpublished order) (holding that a complaint sent by certified mail to defendant's last known business address was sufficient to satisfy due process); *DePiero v. City of Macedonia*, 180 F.3d 770, 787-89 (6th Cir. 1999) (holding that combination of citation on plaintiff's car and summons sent by first class mail was sufficient to satisfy due process); *Armendariz-Mata v. U.S. Dept. of Justice, Drug Enforcement Admin.*, 82 F.3d 679, 683 (5th Cir. 1996) ("Under most circumstances, notice sent by ordinary mail is sufficient to discharge the government's due process obligations.").

The plaintiffs' service of AuWerter was not insufficient because of the fact that AuWerter regularly works out of the offices of his clients and his home, and only works from the Glass offices three days a year. As noted, the constitutional inquiry is whether the service was "reasonably calculated" to provide AuWerter with notice. AuWerter does not allege that plaintiffs were aware that he visited the Glass offices so rarely. Further, even though AuWerter was not often physically present in the Glass offices, it would be reasonable for plaintiffs to believe that mail addressed to him at his employer's offices would reach him.

---

damages that the shareholder had demonstrated were "the damages resulting from tying up [the] funds[, which was] nominal at best, as the corporation continues to receive a healthy return on its investment." *Id.* at 802. In other words, the shareholder's suit was properly dismissed because she could not demonstrate that the corporation suffered *any* damage from the severance agreements, and, therefore, the controversy was not yet ripe. *Id.* Similarly, in *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 290 (3d Cir. 1995), the Third Circuit held, in an ERISA case, that plaintiffs were not entitled to damages where they "failed at trial to prove that they were damaged at all."

[7] AuWerter does not argue on appeal that the method of service violated the Federal Rules of Civil Procedure.

VII.

For the foregoing reasons, we AFFIRM in part and REVERSE in part. We affirm the district court's order granting summary judgment to GECC and dismissing it from the case. We also affirm the district court's entry of summary judgment in favor of defendants on plaintiffs' ERISA § 502(a)(3) claim. We reverse the district court's entry of summary judgment for defendants on plaintiffs' ERISA § 502(a)(2) claim. On the cross-appeal, we reverse the district court's dismissal of the Glass defendants' indemnification cross-claim against NLP.