NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0333n.06

No. 09-4370

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*May 18, 2011*

LEONARD GREEN, Clerk

DAVID H. TULLIS; MICHAEL S. MACK, )
 )
  Plaintiffs-Appellants, )
 )
v. ) ON APPEAL FROM THE UNITED
 ) STATES DISTRICT COURT FOR
UMB BANK, N.A., Employee Benefits Division; ) THE NORTHERN DISTRICT OF
JOHN DOE, 1-10, ) OHIO
 )
  Defendants-Appellees. )
 )
 )

Before: MARTIN, SUHRHEINRICH, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Doctors David Tullis and Michael Mack both lost substantial amounts of money from their pension accounts because their investment advisor, Bill Davis, was a crook. UMB Bank was the trustee of those accounts. The doctors allege that UMB knew that Davis was a fraud years before that information became public, and assert that UMB violated its fiduciary duties under the Employee Retirement Income Security Act by not telling them so. UMB responds that it did not know about Davis's fraud any sooner than the doctors did, and that it falls within ERISA's safe-harbor provision for participant-controlled accounts (29 U.S.C. § 1104(c)). UMB also counterclaims for the costs of this suit. The district court eventually granted summary judgment to UMB as to the doctors' claims and UMB's counterclaim.

The basic problem for the doctors (and the United States as amicus) is that this is a Rule 56 appeal rather than a 12(b)(6) one. And that means they must do more than cite the allegations in their complaint to prevail. For the most part, cites to the complaint are all we have here. Those are not enough to create a genuine issue of material fact, so we affirm.

I.

The doctors both worked at the Toledo Clinic, which had a 401(k) pension plan for its employees. Each of the doctors had their own account within that plan, and each selected Davis as his investment advisor in the early 1980s. UMB became the Trustee of the Clinic's pension plan in 1989.

The doctors chose to have individually directed accounts. These accounts allowed them to choose which assets they invested in, with no limitations on the types of assets they could pick. To purchase an asset, the doctors would sign a directive telling UMB what to do. These forms expressly disclaimed UMB's liability for the transaction. For directives to purchase loans, the forms instructed UMB not to monitor the loans or investigate whether the transactions were somehow illegal. For directives purchasing assets that were not publicly traded, the forms directed UMB to use the asset's cost basis rather than its market value (since there was none available) for accounting purposes. UMB provided the doctors with a monthly summary listing their transactions and current holdings. These statements again made clear that certain assets were listed at cost, not market value.

The doctors allowed Davis to make most of their investment decisions for them. Under his direction, they invested in various non-public securities. In spring 2003, a federal district court ordered Davis's company, Continental Capital, to cease operations. It turned out that Davis had been

defrauding the doctors and that many of the assets in their accounts were worthless. Tullis suffered over $500,000 in losses, Mack close to $1 million.

Since Davis was uncollectible, the doctors eventually sued UMB, alleging that it breached its fiduciary duties in various ways. The plan itself declined to join the suit. UMB moved to dismiss for lack of standing. The district court granted the motion, but we reversed on appeal. *See Tullis v. UMB Bank, N.A.*, 515 F.3d 673 (6th Cir. 2008). (That opinion's description of the facts differ slightly from those here because we no longer must accept the complaint as true.) On remand, UMB moved for summary judgment as to all of the doctors' claims. The district court granted the motion. UMB then moved for summary judgment on its counterclaim for indemnification. The court granted that motion too.

This appeal followed.

## II.

We review de novo the district court's grant of summary judgment, drawing all reasonable factual inferences in favor of the nonmoving party. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 476 (6th Cir. 2010). We review for an abuse of discretion the district court's allowance of an affirmative defense that allegedly was not raised in a timely manner. *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 506 (6th Cir. 2005).

## A.

The doctors first argue that UMB failed to plead the safe-harbor defense in its answer, thereby waiving it. It is true that UMB's answer did not cite the statutory provision that creates the defense. But UMB did more generally plead that "Plaintiffs by their execution of separate

investment directives and their designation of agent, are barred and estopped from any claims for loss or damage against this answering Defendant." Answer at ¶ 45. The district court thought that statement was enough to give the doctors notice of the safe-harbor defense and a chance to rebut it. We agree: section 1104(c) bars claims by participants who take control of their own accounts, which is close enough to what UMB pled to put the doctors on notice of the defense.

The doctors next argue that § 1104(c) does not shield UMB from liability here. That section provides in relevant part:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary [of Labor]) . . . no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

29 U.S.C. § 1104(c)(1)(A).

There are several prerequisites to receiving safe harbor under this section. The doctors concede that all of them are met here except one. The exception is the requirement that a participant exercise "independent control in fact with respect to the investment of assets in his individual account." 29 C.F.R. § 2550.404c-1(c)(1)(i). A participant does not exercise independent control if "[a] plan fiduciary has concealed material non-public facts regarding the investment from the participant." *Id.* § 2550.404c-1(c)(2)(ii). So the doctors assert that UMB concealed from them material non-public facts regarding Davis's fraud, thereby depriving them of "control" over their accounts. Whether the doctors have presented enough evidence for a jury to reach that conclusion is the principal issue here.

The doctors contend that UMB knew Davis was a crook well before that fact became public knowledge in 2003. In support, they point to UMB's involvement in two lawsuits filed by other plan participants against Davis. The first lawsuit was filed by Dr. Joseph Roche. The doctors cite two confidential settlement agreements involving UMB and Davis that allegedly arose from that suit. But that evidence is not part of the record in this appeal. The district court granted UMB's motion for summary judgment on September 21, 2009. The doctors first presented these agreements to the district court in a motion for reconsideration of summary judgment on October 12, 2009. The doctors filed their notice of appeal four days later, which was before the court ruled on that motion. The notice of appeal referred only to the original summary-judgment order. The court eventually denied the motion for reconsideration on January 19, 2010. Under Federal Rule of Appellate Procedure 4(a)(4)(B)(ii), for the contents of that motion to be properly before us, the doctors needed to amend their notice of appeal to include the denial of reconsideration. *See Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665-66 (6th Cir. 2008). Thus the motion to reconsider—and the agreements attached to it—are not before us in this appeal. *See United States v. Universal Mgmt. Servs. Inc.*, 191 F.3d 750, 756-57 (6th Cir. 1999). (We mention as well that we do not see much significance in the Roche agreements in any event.)

The doctors next rely on a suit filed by Dr. and Mrs. Nicholas Lopez in 1999, which named UMB as a co-plaintiff. The fact of that lawsuit was public knowledge, however, so UMB was not required to tell the doctors about it. And there is nothing else in the record before us as to what happened in that suit. The doctors' complaint in this case alleges that, in the Lopez suit, UMB pursued various claims against Davis based upon his fraudulent behavior. But the doctors cannot

merely rely on the allegations in their complaint to defeat summary judgment. Fed. R. Civ. P. 56(e)(2). The doctors' complaint also alleges that the SEC entered a temporary restraining order against Davis in 1999. But there is no evidence of that either; and presumably such an order would have been public anyway, which means that UMB would not have deprived the doctors of control over their accounts by failing to disclose it.

The doctors' only other evidence suggesting that UMB was aware of Davis's fraud is a deposition comment by Larry Rudawsky, UMB's former benefits counsel. Rudawsky's tenure as UMB's counsel lasted from 2002 to 2004. He testified that "at some point" it became obvious that Davis had "acted improperly" in connection with Lopez's account. But Rudawsky never said when that point was, what Davis's improper actions were, or whether there was any reason to suspect that Davis was also defrauding other participants. Rudawsky's testimony thus provides no basis for a jury to find that UMB knew about Davis's fraud before it became publicly known in 2003.

The doctors have failed, therefore, to create a genuine issue as to whether UMB concealed material non-public facts regarding Davis's fraud. And the doctors do not contend that they were subject to improper influence or legally incompetent. Consequently, the doctors exercised "independent control in fact" over their accounts, *see* 29 C.F.R. § 2550.404c-1(c), which is the only safe-harbor prerequisite that they contest.

The Secretary of Labor argues as amicus, however, that § 1104(c) should not apply for a different reason, namely, that the doctors' losses were not "the direct and necessary result" of their control of their investments. *See* 29 C.F.R. § 2550.404c-1(d)(2)(i). The Secretary says that those losses resulted instead from UMB's alleged cover-up of Davis's fraud. But the Secretary too gives

us little more than complaint cites in support of its theory, which it should know is not enough to avoid summary judgment. *See* Fed. R. Civ. P. 56.

The reality is that the doctors chose Davis as their advisor, gave him a blank check to invest their money, and then directed UMB to value their investments at cost, without investigation. Those decisions caused the doctors' losses. UMB's conduct falls within the § 1104(c) safe harbor, which means that the district court was right to grant summary judgment to UMB on the doctors' claims.

B.

The doctors also argue that the district court erred in granting summary judgment to UMB as to its counterclaim for the costs of this suit. The trust agreement and numerous other plan documents plainly state, however, that the doctors must indemnify UMB for those costs. And ERISA itself allows indemnification provisions as long as they "do not relieve a fiduciary of responsibility or liability." *Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) (quoting 29 C.F.R. § 2509.75-4). The doctors dispute none of these points, but argue that we should wave away these provisions as a matter of equity. That argument is without any basis in the law.

We agree with the district court's resolution of the doctors' remaining arguments. The court's judgment is affirmed.